**Arlenza KELLY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 35050.**

Court of Criminal Appeals of Texas.

Jan. 2, 1963.

Rehearing Denied Feb. 20, 1963.

William H. Scott, Jr., Houston, for appellant.

Frank Briscoe, Dist. Atty., Carl E. F. Dally and Erwin G. Ernst, Asst. Dist. Attys., Houston, and Leon B. Douglas, State's Atty., Austin, for the State.

WOODLEY, Presiding Judge.

The offense is keeping and exhibiting for the purpose of gaming, a policy game; the punishment, 2 years. (Art. 642c Vernon's Ann.P.C.)

Reversal is sought upon the ground that the evidence is insufficient to sustain the conviction. Closely connected with this

contention is the claimed error of the trial court in refusing to charge the jury that the mere taking or accepting or placing for another of a bet or wager of money, or a mere offering to take or accept or place for another such a bet or wager of money on a policy game is not proof of keeping or exhibiting for the purpose of gaming a policy game. The two grounds are discussed together in appellant's brief.

■ Officer W. L. Kimble, qualified as an expert on matters involving the game of policy, identified the various figures in the game of policy as follows: The owner of the game, sometimes called the "white man", is the individual who draws the numbers, determines the winners, and prints the tickets or "hit slips". These are turned over, in turn, to a field man. The field man hires writers and pickup men and distributes the hit slips to the writers or to the pickup men and represents the only contact with the owner. There are one or more pickup men who receive the hit slips from the field man and distribute the same to the writers. Writers are the persons who take bets from players and sometimes have sub-writers who also take money and bets from players. The players, who number several hundred, maybe thousands in Harris County at the time of the offense alleged in the indictment, do business only with the writers. The average bet is probably one dollar ($1.-00). Each writer keeps a book in which is contained an original and two carbon copies. When a bet is placed by a player with the writer, the writer marks the bet down in the book, thereby making in his book an original and two carbon copies of his own record, and gives to the player a small ticket which is a carbon copy of the book entry, and represents the player's receipt for his bet. The originals of the sheets in the book are torn out from the book and turned in, together with the money, by the writer to the pickup man who, in turn, delivers these "tear outs" and money to the field man, who, in turn, delivers them to the owner. At this time the field man receives back from the owner the printed "hit slips", containing the listing of the day's winning numbers, which are passed down the same line to the writer who distributes them so that the players will know whether they won or not.

Vice Squad Officers obtained a search warrant authorizing the search of certain premises said to be occupied by appellant and by one Howard Marsh. The search warrant was executed about 4 A.M., at which time only Marsh and his wife were present. Some "policy bets" and $4.26 were found in a water glass in the front room.

Howard Marsh testified that the policy bets and money found in the water glass were left there to be delivered to appellant. He testified that he had previously delivered bets and money to appellant from another party.

Appellant arrived shortly before 7 A.M. He was arrested and a receipt for several policy plays was found upon his person. It was stipulated that the receipt was in appellant's handwriting.

Phillip Beadalio testified that players had left money and bets with him which appellant later picked up.

The jury was instructed that the mere possession of policy paraphernalia alone is not proof of the offense charged in the indictment, and that the jury should acquit unless they believed from the evidence beyond a reasonable doubt that appellant kept or exhibited a policy game. "Keep" was defined as "holding the game in readiness for the purpose of obtaining bettors, or for gaming" and "exhibit" as signifying "the act of displaying the game for the purpose of obtaining bettors."

The case was submitted as one of circumstantial evidence.

The evidence warranted a finding by the jury that appellant's part in the keeping and exhibiting of a policy game was that of pickup man or field man. There is also testimony referring to him as a writer, but no evidence requiring the submission of the

issue that appellant did no more than take, offer to take, accept or offer to accept, or to place or offer to place for a player a bet or wager of money on a policy game.

In the recent case of Jefferson et al. v. State, Tex.Cr.App. 364 S.W.2d 227, we upheld the felony conviction of a "writer" whose function was to take bets and pay off wins up to $10, and who was in possession of policy books.

■ For like reasons, and upon the same authorities, we hold that the pickup man or field man whose function is to receive from the writer, who accepted them from the players, money and bets on a policy game may be convicted as a principal in the keeping and exhibiting of a policy game.

■ Appellant's remaining claim for reversal relates to the testimony of the witness Kimble, that appellant was a writer for the P & T Policy Company, and the trial court's comment in eliciting such testimony from the witness.

Under examination by appellant's counsel, the witness had testified in the absence of the jury that the information he had from Marsh and his wife was that the appellant was a writer for the P & T Company.

Later the witness testified before the jury, without objection, that the "P & T" was the last of some 15 policy games that had operated in Harris County when he began his tour of duty as a police officer attached to the Vice Squad of the Houston Police Department. He was asked what company the appellant wrote for and the court ruled that he could answer "if he knows". Appellant's request for leave to test the witness' qualifications was granted. The voir dire examination was made in the jury's presence, no request having been made that the jury be retired. On this examination the following occurred.

"Q. Although you have placed bets and played the game through other players, you yourself have never placed a bet with Arlenza Kelly, have you?

"A. Not with Kelly, no sir.

"MR. SCOTT: We will object as to what knowledge he may have as being speculative and also—

"THE COURT: He told this Court he knew he was a writer for P & T.

"MR. SCOTT: I don't believe he testified to that.

"THE COURT: I'll ask him. Do you know if on this date the defendant was a writer for the P & T Policy Company?

"A. (By witness) Yes, sir.

"MR. SCOTT: If the Court please, I respectfully object to the comments of the Court—

"THE COURT: The jury will not consider any remarks of the Court except the rulings on the objections. I overrule your objection.

"MR. SCOTT: At this time I move for a mistrial based on the comments of the Court.

"THE COURT: That will be overruled.

"MR. SCOTT: Note our exception."

The name of the company or the policy game was not alleged in the indictment and was not material.

In view of this fact and of the evidence, including the answer of the witness to the court's interrogation, the court did not err in refusing to declare a mistrial.

The evidence is deemed sufficient to sustain the conviction and no reversible error appears.

The judgment is affirmed.